UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | ) |
|  | ) |
| KENNETH BENBOW, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

Criminal No. 10-0051-2 (PLF)
Civil Action No. 19-1574 (PLF)

---

OPINION

Defendant Kenneth Benbow filed a pro se motion under 28 U.S.C. § 2255 to

vacate, set aside, or correct his sentence ("Mot.") [Dkt. No. 613], as amended by his

supplemental motion to vacate, set aside, or correct his sentence ("Supp. Mot.") [Dkt.

No. 642-1], and a memorandum of law [Dkt. No. 642-2] prepared by appointed counsel.  The

United States opposes the motions.  Upon careful consideration of the parties' papers, the

arguments at the May 12, 2021 motions hearing, the relevant legal authorities, and the entire

record in this case, the Court will deny Mr. Benbow's motions.[1]

---

[1]     The Court reviewed the following documents and accompanying exhibits in
connection with the pending motions:  Superseding Indictment as to Mark Pray, Kenneth
Benbow, Alonzo Marlow, et al. ("Superseding Indictment") [Dkt. No. 88]; Joint Motion to
Compel Pre-Authorization Disclosure of Exculpatory Evidence ("Mot. to Compel") [Dkt.
No. 115]; Alonzo Marlow's Motion to Compel Disclosure of Promises of Immunity, Leniency or
Preferential Treatment and Disclosure of Exculpatory Information ("Mot. to Compel") [Dkt.
No. 248]; Mark Pray's Motion to Disclose Identities of Each Confidential Informant Regardless
of Whether they will be Called at Trial ("Mot. to Disclose") [Dkt. No. 254]; Mark Pray's Motion
for Order Related to Discovery and "Regulation of Trial" Issues ("Mot. for Disc. Order") [Dkt.
No. 257]; Mark Pray's Motion for an Order Directing the Government to Provide
Brady/Giglio/Jencks Material Including Impeachment Evidence as to all Hearsay Declarants
("Mot. for Brady Order") [Dkt. No. 268]; Government's Omnibus Opposition to Defendants'
Pretrial Motions ("Gov't Omnibus Opp.") [Dkt. No. 288]; November 1, 2011 Order ("Nov. 1,
2011 Order") [Dkt. No. 302]; December 21, 2011 Order ("Dec. 21, 2011 Order") [Dkt. No. 315];

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.  Pretrial

Defendant Kenneth Benbow's criminal case arises out of his involvement in an interstate drug conspiracy.  Mark Pray, a co-defendant of Mr. Benbow's in the case, was the leader of a drug distribution organization operating out of the Barry Farms public housing complex in Washington, D.C.  See United States v. Danson, Criminal No. 10-0051, 2020 WL 3467887, *1 (D.D.C. June 25, 2020) (explaining that the nature of the enterprise was to "obtain as much money and things of value as possible through the trafficking of controlled substances").  Mr. Benbow was a close associate of Mr. Pray.  See March 6, 2012 AM Trial Tr. at 111 (stating that Mr. Benbow and Mr. Pray were "like brothers").  In 2010, a grand jury indicted Mr. Benbow for crimes related to his role in the drug distribution organization, including participation in conspiracies involving narcotics and racketeering activity.  See

---

Verdict Form [Dkt. No. 395]; Motion for Judgment of Acquittal Notwithstanding the Verdict, or, in the Alternative, for New Trial ("Mot. Acquit.") [Dkt. No. 413]; Memorandum in Support of Motion for Judgment of Acquittal Notwithstanding the Verdict, or, in the Alternative, For a New Trial ("Mem. Mot. Acquit.") [Dkt. No. 413-1]; Judgment [Dkt. No. 467]; Transcript of February 6, 2012 morning trial proceedings ("Feb. 6, 2012 AM Trial Tr.") [Dkt. No. 397]; Transcript of February 15, 2012 morning trial proceedings ("Feb. 15, 2012 AM Trial Tr.") [Dkt. No. 402]; Transcript of February 15, 2012 afternoon trial proceedings ("Feb. 15, 2012 PM Trial Tr.") Transcript of March 6, 2012 morning trial proceedings ("Mar. 6, 2012 AM Trial Tr.") [Dkt. No. 479]; Transcript of March 6, 2012 afternoon trial proceedings ("Mar. 6, 2012 PM Trial Tr."); Transcript of March 7, 2012 morning trial proceedings ("Mar. 7, 2012 AM Trial Tr.") [Dkt. No. 480]; Transcript of March 14, 2012 morning trial proceedings ("Mar. 14, 2012 AM Trial Tr.") [Dkt. No. 482]; Transcript of March 21, 2012 morning trial proceedings ("Mar. 21, 2012 AM Trial Tr."); Memorandum in Support of Amended and Supplemental Motion to Vacate, Set Aside or Correct Under 28 U.S.C. § 2255 ("Mem. Supp. Mot.") [Dkt. No. 642-2]; First Declaration Under Penalty of Perjury by Daryl Travers ("1st Travers Decl.") [Dkt. No. 613]; Second Declaration Under Penalty of Perjury by Daryl Travers ("2d Travers Decl.") [Dkt. No. 642-3]; United States' Opposition to Defendant's Amended and Supplemental Motion to Vacate, Set Aside or Correct [Sentence] Under 28 U.S.C. § 2255 ("U.S. Opp.") [Dkt. No. 692]; March 2, 2012 Memorandum disclosing names of government witnesses ("March 2, 2012 Memo.") [Dkt. No. 692-1]; and Corrected Joint Opening Brief of Appellants in United States v. Kenneth Benbow, USCA Case No. 12-3052, filed 07/06/2017 ("App. Br.").

Superseding Indictment.  Mr. Benbow was also indicted for the murder of Van Johnson, a rival

drug dealer, and the attempted murder of Steven Robinson.  Id. at 37-39.  Finally, Mr. Benbow

was indicted in two counts of using a firearm during crimes of violence (the murder and

attempted murder).  Id. at 48-49.  The case proceeded toward trial.

   In January 2011, Mr. Benbow, along with two of his co-defendants – Mark Pray

and Alonzo Marlow – filed a pretrial motion to compel disclosure of certain exculpatory

evidence that they sought to use to contest the prosecutor's seeking of the death penalty.  United

States v. Pray, 764 F. Supp. 2d 184, 186 (D.D.C. 2011); see Mot. to Compel.  The motion sought

"disclosure of individuals who are equally culpable in the charged murders but will not face the

death penalty and disclosure of a summary of issues which impair [government] witnesses'

credibility."  United States v. Pray, 764 F. Supp. 2d at 186 (internal quotations removed).  The

government opposed the motion, expressing "grave concerns for the safety of its witnesses."  Id.

at 188.  It pointed out that Mr. Pray and Mr. Marlow had been charged with the murder of a

government witness.  See id. at 186.  Judge Rosemary Collyer, who was assigned to this case

until her retirement, denied the motion to compel.  Id.  She held that "[t]he possibility of violent

action against a potential witness – cooperator or not – cannot be ignored," and that "the risks to

the lives of others [were] too real to be overcome by Defendants' request."  Id.

   In August 2011, Mr. Benbow, Mr. Pray, and Mr. Marlow filed pretrial motions

seeking, among other things, disclosure of the names of witnesses the government intended to

call at trial.  See Mot. to Compel; Mot. to Disclose; Mot. for Disc. Order; Mot. for Brady Order.

The government opposed, again citing concerns for witness safety.  Gov't Omnibus Opp.

at 36, 55-56, 59.  Judge Collyer held a three-day hearing on the motions, see Nov. 1, 2011 Order

at 1, and later issued an opinion and order denying the motions, see id. at 3-5.  Because of her

concern for the safety of witnesses, on December 21, 2011, Judge Collyer adopted a policy permitting the government to keep the identity of civilian witnesses private until the Friday before those witnesses were expected to testify.  Dec. 21, 2011 Order at 2.

### B.  Trial

An eight-week jury trial was held from February 2012 to April 2012, during which time the government presented evidence that Mr. Benbow was a participant in the narcotics and RICO conspiracies.  For example, the government introduced evidence that in March 2008, Mr. Benbow was involved in a car accident.  See Mar. 14, 2012 AM Trial Tr. at 37-39.  When police arrived at the scene, Mr. Benbow had fled, but a handgun was found on the ground near the car.  Id. at 39.  The handgun had rubber bands wrapped around its handle, id. at 54, similar to guns that had been connected to Mr. Pray's drug distribution activities, see id. at 189; Feb. 6, 2012 AM Trial Tr. at 39.  A later search of the car produced crack cocaine, a digital scale, and papers with Mr. Benbow's name on them.  Mar. 14, 2012 AM Trial. Tr. at 40, 56, 59-60.  FBI Special Agent Catherine Hanna testified about calls between Mr. Benbow and Mr. Pray in 2020.  Those calls concerned the acquisition and distribution of cocaine.  See Feb. 15, 2012 AM Trial Tr. at 29-36, 42-47.  One of those calls led to a U.S. Park Police detective witnessing Mr. Benbow engage in what appeared to be a drug transaction with Mr. Pray.  Mr. Benbow drove to a Home Depot parking lot, where Mr. Pray and Mr. Marlow parked next to him in a Range Rover.  Feb. 15, 2012 PM Trial Tr. at 59-60.  Mr. Benbow, with a bag in hand, got into the Range Rover for about five minutes.  Id. at 61.  When Mr. Benbow exited the Range Rover, he did not have the bag with him.  Id.

On March 2, 2012, the government disclosed its witness list for the upcoming week.  Included on that list was Darryl Travers, Mr. Benbow's stepbrother.  See March 2, 2012

Memo.  The government also provided <u>Jencks</u> and <u>Giglio</u> materials related to Mr. Travers.  <u>See</u>

<u>id</u>.  These materials included summaries of FBI interviews of Mr. Travers; notes from a Park

Police interview of Mr. Travers concerning the murder of Van Johnson and the attempted murder

of Steven Robinson; and transcripts of Mr. Travers' grand jury testimony.  U.S. Opp.

at 11-12, 12 n.13.  Mr. Travers testified on March 6 and March 7, 2012.  <u>See</u> Mar. 6, 2012 AM

Trial Tr.; Mar. 7, 2012 AM Trial Tr.

Mr. Travers testified about his relationship with Mr. Benbow and about Mr.

Benbow's relationship with Mr. Pray.  According to Mr. Travers, he and Mr. Benbow met

in 1996 when Mr. Travers' father married Mr. Benbow's mother.  Mar. 6, 2012 AM Trial Tr.

at 81.  Beginning in 2000, Mr. Travers and Mr. Benbow sold drugs together.  <u>Id</u>. at 89.  They did

so until Mr. Travers' arrest in 2006.  <u>Id</u>. at 96.  Mr. Travers testified that at the time of his arrest,

Mr. Benbow and Mr. Pray "were friends, they was cool," and that the three of them would go to

clubs together.  <u>Id</u>. at 97-98.  He also testified that that in 2005 or 2006, he and Mr. Benbow

bought cocaine from Mr. Pray on at least two occasions.  <u>Id</u>. at 98.  Mr. Travers would give his

money to Mr. Benbow, who would in turn give it to Mr. Pray in exchange for cocaine.  <u>Id</u>.

at 98-99.  After his arrest in 2006, Mr. Travers was incarcerated for two years.  He testified that

when he returned to the community in 2008, Mr. Benbow and Mr. Pray were closer than they

were in 2006 – "like brothers."  <u>Id</u>. at 110-11.

On cross-examination, Mr. Travers agreed that neither he nor, to his knowledge,

Mr. Benbow had ever sold drugs in Barry Farms, where Mr. Pray's operation was based.

Mar. 6, 2012 PM Trial Tr. at 68.  He also stated that he and Mr. Benbow had purchased narcotics

from "a few different people," <u>id</u>. at 66, and that the two instances in which he purchased

narcotics from Mr. Pray were a small portion of the drug transactions that Mr. Travers

participated in during that time, id. at 70.  Mr. Travers agreed that he was not "in business with Mr. Pray."  Id. at 70.  When asked if Mr. Pray and Mr. Benbow were partners or if Mr. Benbow worked for Mr. Pray or vice versa, Mr. Travers stated:  "No, I wouldn't say that."  Id. at 72.  He also confirmed that he and Mr. Benbow neither shared their proceeds with Mr. Pray, nor did Mr. Pray share proceeds from his drug distribution activities with them.  Id. at 76.

On September 23, 2008, Steven Robinson and Van Johnson, drug dealers from 37th Street, left a club called Tradewinds and drove down Branch Avenue.  Mar. 6, 2012 AM Trial Tr. at 25-27, 53-54.  At some point, gunshots began hitting their car.  Id. at 27-28, 54. Shots struck Mr. Johnson in the chest and Mr. Robinson in the chest and side.  Id. at 28-30.  The car flipped over, and Mr. Robinson lost consciousness.  Id. at 32.  Mr. Johnson ultimately died of gunshot wounds.  Id. at 33.  Mr. Travers' testimony connected Mr. Benbow and Mr. Pray to the shooting.  Mr. Travers testified that in September 2008, Mr. Benbow was concerned because a man from 37th Street was "running his mouth" and falsely associating Mr. Benbow with a group from 17th Street when Mr. Benbow was from 18th Street, which is a "different group of people." Id. at 119-20.  Mr. Travers testified that this would be a dangerous rumor because it could lead to "playing with [Mr. Benbow's] life" due to an existing conflict between the 37th Street and 17th Street groups.  Id. at 126.

Mr. Travers testified that on the morning of September 24, 2008, he awoke to several missed phone calls from Mr. Benbow.  Mar. 6, 2012 AM Trial Tr. at 127.  When Mr. Travers called back, Mr. Benbow told him to come to Barry Farms.  Id.  When Mr. Travers arrived, Mr. Benbow and Mr. Pray were both present and explained that they had shot at a car on Branch Avenue and flipped it.  Mar. 6, 2012 PM Trial Tr. at 8, 10.  Mr. Pray demonstrated shooting two guns out of the sunroof of the car they were driving, and Mr. Benbow "was just

laughing, like he just had this little smile on his face." Id. at 9.  Mr. Travers testified that he understood Mr. Benbow had been driving the car.  See id. at 9 ("[Mr. Benbow] . . . crashed the car leaving the scene.").  Mr. Benbow later told Mr. Travers that the man they had shot at was the "dude that was running his mouth from 37th." Id. at 17.

During closing arguments, counsel for Mr. Benbow argued that Mr. Travers had lied on the witness stand regarding the shooting.  See Mar. 21, 2012 AM Trial Tr. at 72.  He pointed to evidence that a call was placed from Mr. Benbow to Mr. Pray at the exact time that Mr. Benbow was supposed to have been driving the car and Mr. Pray was supposed to have been shooting. Id. at 72-73.  Defense counsel also argued that Mr. Benbow was not a part of Mr. Pray's drug distribution operation.  Counsel stated:

> Every witness that came into this courtroom and talked about the drug dealing that went on in Barry Farms all told you the same thing. That man right there wasn't from Barry Farms, never sold drugs in Barry Farms, never bought drugs from anyone in Barry Farms.

Id. at 67.  He further argued:

> You're here to determine whether or not he was a part of the drug conspiracy they allege. And ladies and gentlemen, I will tell you the answer to that is very simple, he just wasn't. He just didn't operate in Barry Farms. He wasn't a part of the Barry Farms operation.

Id. at 68; see also id. at 69 ("[D]id you ever see Kenneth Benbow selling drugs in Barry Farm? No."); id. at 70 ("What's [Mr. Benbow's] real crime?  He's got a friend.  His friend is Mark Pray.").  And with regard to whether Mr. Benbow committed the murder and attempted murder in order to maintain his position in the enterprise, counsel argued:

> [The prosecution] wanted Mr. Travers to say [the shooting] had something to do with drugs, it had something to do with the rivalry between Barry Farms and 37th Street.  Mr. Travers didn't say that. He said 17th Street and 37th Street.  [Defense co-counsel] asked him a series of questions toward the end of his cross-examination to establish one fact, ladies and gentlemen, this had nothing to do with

drugs.  This had nothing to do with collecting money, this had
nothing to do with improving your position in any organization.
This had all to do with something going on between 17th Street and
37th Street.  Something nobody even told you about.  Mark Pray
isn't from either one.  Why isn't Kenneth Benbow out the window
shooting.  This is his beef according to Travers.  Not Mark Pray.

Id. at 75-76 (emphasis added).[2]

### C.  Postconviction Proceedings

On April 3, 2012, Mr. Benbow was convicted of, among other things, one count

of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; one count of

conspiracy to participate in a racketeering enterprise, in violation of the Racketeer Influenced

and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(d); one count of murder in aid of

racketeering of Van Johnson, in violation of the Violent Crimes in Aid of Racketeering

("VICAR") statute, 18 U.S.C. § 1959(a)(1); one count of attempted murder in aid of racketeering

of Steven Robinson, in violation of the VICAR statute, 18 U.S.C. § 1959(a)(5); and two counts

of using a firearm during those crimes of violence, in violation of 18 U.S.C. § 924(c)(1).  Verdict

Form at 13-17.  Following his conviction, Mr. Benbow filed a motion for judgment of acquittal

notwithstanding the verdict or, alternatively, for a new trial.  See Mot. Acquit.  Judge Collyer

denied the motion.  United States v. Pray, 869 F. Supp. 2d 44, 51 (D.D.C. 2012).  Mr. Benbow

was sentenced on June 22, 2012 to three terms of life imprisonment without parole, plus an

additional thirty-five years.  Judgment at 3.  Mr. Benbow appealed, and the D.C. Circuit affirmed

all of his convictions except one telephone-related charge, which was ordered vacated on

remand.  United States v. Benbow, 709 F. App'x 25, 29 (D.C. Cir. 2018).  Mr. Benbow filed a

---

[2]     Mr. Pray's trial counsel likewise argued that the murder of Mr. Johnson "didn't
have a thing to do with the enterprise or a conspiracy if it exists."  Id. at 168; id. ("According to
Darryl Travers, it's not a VICAR murder.").

petition for writ of certiorari, but the Supreme Court of the United States denied the petition.
Benbow v. United States, 138 S. Ct. 2036 (2018) (mem.).

Following the Supreme Court's denial of certiorari, Mr. Benbow filed a
Section 2255 motion before Judge Collyer. See Mot. That original motion alleges ineffective
assistance of trial counsel and Brady violations. The case was transferred to this Court on
January 7, 2020, upon Judge Collyer's retirement. Mr. Benbow subsequently filed an amended
Section 2255 motion, expanding on his ineffective assistance of trial counsel and Brady claims
and adding a claim of ineffective assistance of appellate counsel. See Supp. Mot. This Court
held argument on the motion on May 12, 2021.


## II.  LEGAL STANDARD

A federal prisoner may move to vacate, set aside, or correct a sentence if he
believes that the sentence was imposed "in violation of the Constitution or laws of the United
States, or that the court was without jurisdiction to impose such sentence, or that the sentence
was in excess of the maximum authorized by law, or is otherwise subject to collateral
attack." 28 U.S.C. § 2255. "The circumstances under which such a motion will be granted,
however, are limited in light of the premium placed on the finality of judgments and the
opportunities prisoners have to raise most of their objections during trial or on direct appeal."
United States v. Clark, 382 F. Supp. 3d 1, 19-20 (D.D.C. 2019) (quoting United States v.
Henry, 821 F. Supp. 2d 249, 253 (D.D.C. 2011)). To obtain relief under Section 2255, a prisoner
must "clear a significantly higher hurdle than would exist on direct appeal." United States v.
Frady, 456 U.S. 152, 166 (1982). The defendant "bears the burden of establishing a denial of
constitutional rights by a preponderance of the evidence." United States v. Clark, 382 F.
Supp. 3d at 27 (citing Daniels v. United States, 532 U.S. 374, 381-82 (2001)).

### III.  DISCUSSION

#### A.  Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of counsel, which implicate Sixth Amendment rights, are analyzed under the two-part test set out in Strickland v. Washington, 466 U.S. 668 (1984).  As the D.C. Circuit has explained, Strickland requires the defendant to establish the following:

> First . . . that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second . . . that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

United States v. Gooch, 842 F.3d 1274, 1279 (D.C. Cir. 2016) (quoting Strickland v. Washington, 466 U.S. at 687).  "Importantly, the defendant must establish *both* deficient performance and prejudice in order to prevail.  Failure on either prong of the Strickland inquiry precludes relief."  United States v. Clark, 382 F. Supp. 3d at 27.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Strickland v. Washington, 466 U.S. at 697.

When determining whether an attorney rendered deficient performance, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Strickland v. Washington, 466 U.S. at 688.  The defendant must overcome a "strong presumption" that "the challenged action might be considered sound trial strategy" and that "counsel's conduct falls within the range of reasonable professional assistance."  Id. at 689.  Where "the record does not explicitly disclose . . . counsel's actual strategy or lack thereof," this "presumption may only be rebutted by showing that no sound strategy posited by the [opposing

party, here the government] could have supported the conduct." United States v. Abney, 812 F.3d 1079, 1087 (D.C. Cir. 2016) (quoting Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005)).

In order to show prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694.  "The defendant shoulders 'the burden of showing, not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions.'" United States v. Bertram, 209 F. Supp. 3d 243, 254 (D.D.C. 2016) (quoting United States v. Frady, 456 U.S. at 170).  To determine if counsel's acts or omissions prejudiced a defendant, this Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." United States v. McDade, 639 F. Supp. 2d 77, 80 (D.D.C. 2009).  "To meet the prejudice prong of *Strickland* when making a failure to investigate claim . . . this Circuit requires a defendant to make 'a comprehensive showing as to what the investigation would have produced.  The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information . . . would have produced a different result.'" United States v. Campbell, No. CR. 92-0213, 2004 WL 5332322, at *14 (D.D.C. Sept. 1, 2004) (quoting United States v. Askew, 88 F.3d 1065, 1073 (D.C. Cir. 1996)).

Mr. Benbow argues that his trial counsel rendered ineffective assistance by: (1) failing to interview Mr. Travers before Mr. Travers testified; (2) failing to move for a mistrial; and (3) failing to adequately argue in the motion for judgment of acquittal that the

government had failed to meet its burden to prove violations of the VICAR statute.  Mem. Supp. Mot. at 28-29, 38.  The Court will take each argument in turn.

### 1.  Failure to Interview

Mr. Benbow argues that his trial counsel rendered ineffective assistance by failing to interview Mr. Travers prior to Mr. Travers giving testimony at trial.  He contends that he was prejudiced by this failure because such an interview could have revealed "additional evidence that Mr. Travers could offer on cross-examination in support of a defense that the shooting [of Mr. Johnson and Mr. Robinson] was unrelated to Mr. Pray's organization."  Mem. Supp. Mot. at 36.  Mr. Benbow argues that such testimony from Mr. Travers would have rendered the government unable to establish all elements of a VICAR murder.  Id. at 37-38.

Assuming without deciding that trial counsel's performance was deficient, Mr. Benbow has not established a reasonable probability that, had his trial counsel interviewed Mr. Travers prior to trial, the result of the proceeding would have been different.  See Strickland v. Washington, 466 U.S. at 694.  In particular, he fails to identify any information that trial counsel would have gleaned from interviewing Mr. Travers that wasn't otherwise provided to defense counsel before trial or elucidated at trial.  See United States v. Campbell, 2004 WL 5332322, at *14.  Mr. Benbow points to two declarations provided by Mr. Travers and submitted in support of the instant motion.  See 1st Travers Decl.; 2d Travers Decl.  He contends that the facts in these declarations would have  "ma[d]e it crystal clear that there was no conspiracy with Mr. Benbow, Mr. Travers, and Mr. Pray."  Mem. Supp. Mot. at 29.  In his declarations, Mr. Travers states that Mr. Benbow was not in business with Mr. Pray, nor was he a part of Mr. Pray's organization.  1st Travers Decl. ¶ 13  2d Travers Decl. ¶ 21.  He also states that Mr. Benbow and Mr. Pray were just social friends.  2d Travers Decl. at 18-19.  Finally, he asserts that the murder

of Mr. Johnson and attempted murder of Mr. Robinson were unrelated to Mr. Pray's drug

operation.  Id. ¶ 22-23; 1st Travers Decl. ¶ 18.

   At trial, defense counsel elicited this very same information from Mr. Travers on

cross-examination.  See Mar. 6, 2012 PM Trial Tr. at 68 (stating that Mr. Benbow had never sold

drugs in Barry Farms); id. at 72 (stating that Mr. Benbow was not partners with Mr. Pray, nor did

either man work for the other); id. at 76 (confirming that Mr. Benbow did not share the proceeds

of his drug transactions with Mr. Pray, or vice versa); id. at 91-92 (explaining that Mr. Benbow

was upset because he was being associated with the wrong group, which could have endangered

his reputation or life); Mar. 6, 2012 AM Trial Tr. at 97-98 (stating that Mr. Benbow and Mr.

Pray were friends).

   Mr. Travers testified to each piece of information that Mr. Benbow now claims

would have changed the result of his trial, and the testimony supported Mr. Benbow's argument

that he was not a part of Mr. Pray's drug distribution operation and did not commit the murder

and attempted murder as part of or in connection with racketeering activity, and thus in violation

of the VICAR statute.  The jury heard all this and clearly did not credit Mr. Travers' testimony.

Even if Mr. Benbow's trial counsel had interviewed Mr. Travers prior to his testifying, therefore,

the result of the trial would not have been different.  See United States v. Burwell, 83 F.

Supp. 3d 6, 12-13 (D.D.C. 2015) (finding no prejudice where defendant argued that trial counsel

did not interview or prepare an alibi witness "properly" before trial, but counsel "elicited the

relevant facts" related to the alibi on direct examination and redirect examination).  Because Mr.

Benbow cannot establish prejudice, the Court holds that he has failed to prove that Mr.

Benbow's trial counsel rendered ineffective assistance by failing to interview Mr. Travers.

2.  Failure to Move for Mistrial

Mr. Benbow also argues that he was prejudiced by his trial counsel's failure to move for a mistrial on the counts related to the shooting of Mr. Johnson and Mr. Robinson. Mem. Supp. Mot. at 29.  He maintains that the testimony of Mr. Travers showed that "the 2008 shooting was not part of the same act or transaction or the same series of acts or transaction[s] that constituted the RICO offenses or the drug conspiracy-related offenses" and therefore the shooting-related counts should not have been tried in the same proceeding as the other counts. Id. at 31.  He states that although this argument would normally have supported a motion to sever, that motion would not have been timely if filed mid-trial.  He therefore contends that trial counsel should have filed a motion for mistrial.  Id. at 30-31.

As an initial matter, "severance may be warranted . . . 'at all stages of trial' because the district court has a 'continuing duty' to sever counts if it finds a risk of prejudice." United States v. Carson, 455 F.3d 336, 372-73 (D.C. Cir. 2006) (quoting Schaffer v. United States, 362 U.S. 511, 514 (1960)).  Trial counsel therefore could have filed a motion to sever at any time, rather than waiting and moving for a mistrial.  More importantly, whether seeking a severance or a mistrial, the defendant bears the burden of showing prejudice.  See id. at 374 ("The first hurdle in obtaining a severance under Rule 14 is a showing of prejudice, which the defendant has the burden of establishing.") (citations omitted); United States v. Eccleston, 961 F.2d 955, 959 (D.C. Cir. 1992) ("The decision whether to grant a mistrial generally rests within the sound discretion of the trial court, and the single most important factor in making that determination is the extent to which the defendant has been prejudiced.").  Severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

innocence." United States v. Carson, 455 F.3d at 374 (quoting Zafiro v. United States, 506 U.S. 534, 540 (1993)).  And courts determine whether a mistrial is warranted by "consider[ing] a number of factors, including the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict." United States v. McLendon, 378 F.3d 1109, 1112 (D.C. Cir. 2004).

Mr. Benbow has not shown that it is likely he would have been able to make this showing of prejudice at trial.  The government presented evidence of a drug distribution relationship between Mr. Benbow and Mr. Pray both before and after the shooting.  See Mar. 6, 2012 AM Trial Tr. at 98-99; Mar. 14, 2012 AM Trial Tr. at 39, 54; Feb. 15, 2012 PM Trial Tr. at 59-60.  The evidence therefore did not unequivocally demonstrate that the shooting was unrelated to the other crimes.  It was for the jury to weigh this evidence against and alongside the testimony of Mr. Travers and reach "a reliable judgment about guilt or innocence." United States v. Carson, 455 F.3d at 374.  Mr. Benbow has not established that the jury would have been prevented from making a reliable judgment simply because the charges were tried together.

Moreover, while it may be true that Mr. Benbow had a better chance of being acquitted of the shooting-related charges if they were tried separately from the RICO and narcotics charges, "[a] showing that the defendant 'may have a better chance of acquittal in separate trials' is [an] insufficient" basis for a severance.  United States v. Carson, 455 F.3d at 374 (quoting Zafiro v. United States, 506 U.S. at 540).  And Mr. Benbow has not explained how he was unfairly prejudiced by the admission of "relevant and competent evidence" bearing on his role in the shooting of Mr. Johnson and Mr. Robinson.  See Zafiro v. United States, 506 U.S. at 540.  Nor has he argued that the shooting-related evidence was inadmissible or in any

other way violated a specific trial right.  See United States v. Carson, 455 F.3d at 374; United States v. McLendon, 378 F.3d at 1112.

   Given that Mr. Benbow would have been unlikely to establish prejudice at trial, trial counsel reasonably could have concluded in his professional judgment that filing a motion for severance or mistrial would be futile.  See United States v. Wilson, 15 F. Supp. 3d 126, 138 (D.D.C. 2014) ("Whether . . . a motion to exclude evidence . . . would have been worthwhile was for [defense counsel] to decide within his professional judgment.").  And "[f]ailure to raise a meritless claim is not evidence of ineffective assistance."  United States v. Brown, 449 F.3d 154, 159 (D.C. Cir. 2006); see also United States v. Wilson, 15 F. Supp. 3d at 138 (concluding that trial counsel "was not ineffective for omitting an argument that lacks merit").  Mr. Benbow has failed to overcome the strong presumption that such a decision falls within "the range of reasonable professional assistance."  Strickland v. Washington, 466 U.S. at 689.  He has not established that his trial counsel rendered ineffective assistance for failing to move for a mistrial or severance.

### 3.  Sufficiency of the Evidence

   Finally, Mr. Benbow argues that trial counsel failed to make adequate arguments on insufficiency of the evidence during closing argument and in the motion for judgment of acquittal.  Mem. Supp. Mot. at 28, 32-33.  He contends that trial counsel should have argued that the government failed to present sufficient evidence that Mr. Benbow was a member of Mr. Pray's organization and that Mr. Benbow participated in the shooting of Mr. Johnson and Mr. Robinson "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a); see Mem. Supp. Mot. at 34.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam). "Judicial review of a defense attorney's summation is therefore highly deferential . . . ." Id. at 6. And "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." Id. at 8.

Mr. Benbow's argument concerning closing argument fails because trial counsel did, in fact, make precisely the arguments Benbow now urges, both during his closing argument and in the motion for judgment of acquittal. See Mar. 21, 2012 AM Trial Tr. at 67 (arguing that Mr. Benbow was not a part of the Barry Farms operation); id. at 68 (arguing that Mr. Benbow was not a part of the drug conspiracy); see also id. at 69 ("[D]id you ever see Kenneth Benbow selling drugs in Barry Farm?  No."); id. at 70 ("What's [Mr. Benbow's] real crime?  He's got a friend.  His friend is Mark Pray."); id. at 75-76 (arguing that the shooting had nothing to do with the drug conspiracy or furthering Mr. Benbow's position within Mr. Pray's organization). Likewise, in the motion for judgment of acquittal, trial counsel argued that the government had not sustained its burden to show that "(1) defendant BENBOW committed the shooting or (2) that the motive for the criminal act qualifies it under the [VICAR] statute for prosecution." Mem. Mot. Aquit. at 9.  Counsel pointed to Mr. Travers' testimony that the shooting "was not motivated by a drug gang rivalry, 'beef,' drug debt, or battle over drug territory," but was instead motivated by "Mr. Van Johnson making false claims against defendant BENBOW."  Id. at 8. Counsel also argued that the government's evidence failed to show that Mr. Benbow was part of a conspiracy to distribute phencyclidine, or phenylcyclohexyl piperidine ("PCP").  Id. at 5-6.

Trial counsel therefore <u>twice</u> argued that the government had failed to prove that Mr. Benbow's motive was to maintain his position in the narotics enterprise. Mr. Benbow cannot establish ineffective assistance of counsel simply by arguing that trial counsel should have presented these arguments differently. <u>See</u> <u>Yarborough v. Gentry</u>, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); <u>United States v. Wilson</u>, 15 F. Supp. 3d at 138-39 ("[Defendant] might now prefer to have had counsel place a greater emphasis on these arguments, but this does not establish ineffective assistance of counsel."). And although trial counsel did not argue insufficiency of the evidence concerning Mr. Benbow's participation in all drug conspiracies in the motion for judgment of acquittal, counsel did contest Mr. Benbow's participation in the PCP conspiracy. "The issues counsel omitted were not so clearly more persuasive than those he discussed that their omission can only be attributed to a professional error of constitutional magnitude." <u>Yarborough v. Gentry</u>, 540 U.S. at 8. The Court finds that trial counsel's representation fell within "the range of reasonable professional assistance." <u>Strickland v. Washington</u>, 466 U.S. at 689. Mr. Benbow has failed to prove that his trial counsel rendered ineffective assistance for failing to argue insufficiency of the evidence.

### B. Ineffective Assistance of Appellate Counsel

Mr. Benbow argues that appellate counsel rendered ineffective assistance by failing to argue insufficiency of the evidence. Mem. Supp. Mot. at 49. The United States responds that this claim is barred by a one year statute of limitations. U.S. Opp. at 36.

"Section 2255(f) imposes a timeliness requirement on [a 2255 motion]: 'A 1-year period of limitation shall apply to a motion under this section.'" <u>United States v. Arrington</u>, No. 19-3086, 2021 WL 2932260, at *2 (D.C. Cir. July 13, 2021) (quoting 28 U.S.C. § 2255(f)).

"'The limitation period shall run from the latest of' several events, including, as relevant here, 'the date on which the judgment of conviction becomes final.'" Id. (quoting 28 U.S.C. § 2255(f)(1)). But a defendant may be permitted to amend a timely Section 2255 motion if that amendment "relate[s] back" to the original motion, "thereby avoiding statute of limitations problems that otherwise might have beset the amendment." United States v. Hicks, 283 F.3d 380, 387 (D.C. Cir. 2002). An amendment relates back to an original pleading when "the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. CIV. P. 15(c)(2). "Accordingly, while amendments that expand upon or clarify facts previously alleged will typically relate back, those that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously." United States v. Hicks, 283 F.3d at 388. An amendment "that attempts to introduce a new legal theory based on facts different from those underlying the timely claims may not" relate back. Id.

Mr. Benbow's judgment of conviction became final on May 21, 2018, when the Supreme Court denied his petition for a writ of certiorari. See Benbow v. United States, 138 S. Ct. 2036 (2018) (mem.); Clay v. United States, 537 U.S. 522, 527 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). His one-year limitations period therefore started to run on May 21, 2018. Mr. Benbow timely filed a 2255 motion on May 20, 2019. See Mot.[3] Mr. Benbow's timely 2255 motion alleged ineffective assistance of

---

[3]     This pro se motion was not filed on the docket until May 25, 2019. But it was stamped as received by the Court on May 20, 2019. See Mot. at 13. The United States therefore does not assert that the original 2255 motion is time-barred. Gov't Opp. at 20 n.14. The Court agrees and will treat the motion as timely filed.

trial counsel and Brady violations.  See id. at 7-16.  His amended motion, however, also alleges

ineffective assistance of appellate counsel.  Mem. Supp. Mot. at 49.  This is a new claim that is

factually and procedurally distinct from Mr. Benbow's earlier claims because it concerns a

different proceeding – appeal – involving different attorneys appearing before a different court.

This is precisely the type of "new legal theory based on facts different from those underlying the

timely claims" that is precluded by relation back principles.  See United States v. Hicks, 283

F.3d at 388.  This Court concludes that Mr. Benbow's ineffective assistance of appellate counsel

claim does not relate back to the timely motion and is therefore time-barred.

       Even if Mr. Benbow's claim were timely, he fails to show that appellate counsel

rendered ineffective assistance.[4]  Mr. Benbow asserts that appellate counsel should have argued

that the government presented insufficient evidence that Mr. Benbow was a member of Mr.

Pray's organization and that Mr. Benbow participated in the shootings of Mr. Johnson and Mr.

Robinson "for the purpose of gaining entrance to or maintaining or increasing position in an

enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a); Mem. Supp. Mot. at 49.  With

regard to the connection between the shooting and the conspiracy, just as with trial counsel, Mr.

Benbow's appellate counsel made precisely this argument on appeal.  The opening brief in Mr.

Benbow's appeal argued that

> there was no link between the shooting of Johnson and Robinson
> and the charged racketeering enterprise. The motive for the
> shootings was not to further any drug business. The motive was to
> silence someone telling lies about Benbow.  Benbow's membership
> in any racketeering enterprise was irrelevant to the offense; it would

---

    [4]    The Strickland v. Washington test for ineffective assistance of counsel applies
with equal force to claims concerning trial and appellate counsel.  See, e.g., Smith v.
Murray, 477 U.S. 527, 535-36 (1986) (applying Strickland to claim of attorney error on appeal);
Payne v. Stansberry, 760 F.3d 10, 13 (D.C. Cir. 2014) (noting that the Strickland standard
applies to ineffective assistance of appellate counsel claims).

> have happened regardless of whether Benbow was involved in any rackettering [sic] enterprise.

App. Br. at 84-85.  Mr. Benbow therefore cannot show that appellate counsel rendered ineffective assistance on this ground.

Mr. Benbow is correct, however, that appellate counsel did not argue insufficiency of the evidence on the question of whether Mr. Benbow was a member of Mr. Pray's organization.  See generally App. Br.  Nonetheless, he has failed to show that no "sound strategy" supported appellate counsel's decision to omit that specific argument.  United States v. Abney, 812 F.3d at 1087.  Appellate counsel may reasonably have concluded that other arguments were more meritorious and therefore warranted greater time and attention.  Indeed, the brief filed by appellate counsel was 148 pages, at least 65 of which were devoted to Mr. Benbow's arguments.  See generally App. Br.  This Court concludes that such a judgment falls "within the range of reasonable professional assistance."  Strickland v. Washington, 466 U.S. at 689; see United States v. Gooch, 23 F. Supp. 3d 32, 45 (D.D.C. 2014) ("[A]ppellate counsel is not required to raise every conceivable issue on appeal.  Appellate counsel is expected to exercise his or her professional judgment to focus the litigation and raise those claims that are most likely to succeed.")

## C.  *Brady* Violations

Finally, Mr. Benbow argues that the government failed to abide by its Brady obligations when it disclosed materials related to Mr. Travers in an untimely manner.  See Mem. Supp. Mot. at 41-43.  The United States responds that Mr. Benbow's Brady claim is procedurally barred because Mr. Benbow failed to raise the issue on direct appeal and has failed to demonstrate cause and prejudice to excuse the default.  U.S. Opp. at 2.

21

1.   Procedural Bar

"The procedural default rule generally precludes consideration of an argument
made on collateral review that was not made on direct appeal, unless the defendant shows cause
and prejudice."  United States v. Hughes, 514 F.3d 15, 17 (D.C. Cir. 2008).  "To demonstrate
cause, a defendant must show that 'some objective factor external to the defense impeded
counsel's efforts to comply with the . . . procedural rule.'"  United States v. Williamson,
No. CR 14-151, 2020 WL 418551, at *8 (D.D.C. Jan. 27, 2020) (quoting Murray v. Carrier, 477
U.S. 478, 488 (1986)).  To establish prejudice, a defendant bears the burden of showing that
"there is a reasonable probability that, but for [the errors], the result of the proceeding would
have been different."  United States v. Pettigrew, 346 F.3d 1139, 1144 (D.C. Cir. 2003) (citations
omitted).

Mr. Benbow did not raise a Brady claim on direct appeal, and he has not shown
cause for his failure to do so.  He argues that his procedural default is excused because his
appellate counsel rendered ineffective assistance.  Mem. Supp. Mot. at 45 (citing Murray v.
Carrier, 477 U.S. at 388 ("[I]f the procedural default is the result of ineffective assistance of
counsel, the Sixth Amendment itself requires that responsibility for the default be imputed
to the State . . . .")).  But the Court has already concluded that Mr. Benbow has failed to establish
ineffective assistance of appellate counsel.  See Section III(B), supra.  And Mr. Benbow has
failed to identify any other "objective factor external to the defense" that prevented appellate
counsel from raising this claim.  See Murray v. Carrier, 477 U.S. at 488.  Mr. Benbow therefore
cannot raise this claim in his 2255 motion.

22

2.   Merits of <u>Brady</u> Claim

Even if Mr. Benbow were not procedurally barred from bringing this claim, it fails on the merits.  To prevail on a <u>Brady</u> claim, the movant must satisfy three requirements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued."  <u>United States v. Flynn</u>, 411 F. Supp. 3d 15, 26 (D.D.C. 2019).  "To satisfy the prejudice component, the defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  <u>United States v. Sitzmann</u>, 893 F.3d 811, 826 (D.C. Cir. 2018) (citation omitted).  While there is no explicit timing requirement, "[d]isclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure."  <u>United States v. Celis</u>, 608 F.3d 818, 835 (D.C. Cir. 2010) (citation omitted).  But "even mid-trial disclosures may be effectively used by defense counsel."  <u>United States v. Clarke</u>, 767 F. Supp. 2d 12, 40 (D.D.C. 2011).  "[W]here disclosure was made but made late, 'the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result' and not just that the evidence was material."  <u>United States v. Andrews</u>, 532 F.3d 900, 907 (D.C. Cir. 2008) (quoting <u>United States v. Dean</u>, 55 F.3d 640, 663 (D.C. Cir. 1995)).  "[A] new trial is rarely warranted based on a *Brady* claim where the defendant[ ] obtained the information in time to make use of it."  <u>Id</u>. (quoting <u>United States v. Wilson</u>, 160 F.3d 732, 742 (D.C. Cir. 1998)).

Assuming without deciding that the evidence provided by Mr. Travers is exculpatory and that the government failed to disclose it, Mr. Benbow cannot show that

prejudice ensued.  Mr. Benbow asserts that if the Travers evidence had been timely provided to defense counsel, it would have supported a theory that the government had failed to meet its burden to show a connection between the shooting of Mr. Johnson and Mr. Robinson and the conspiracy.  Mem. Supp. Mot. at 43.  Mr. Benbow contends that there would be a reasonable probability of a different outcome had Mr. Travers' identity been disclosed in a timely manner. Id.  But, as explained in Section III(A)(1), supra, counsel pursued this very theory at trial and in the motion for judgment of acquittal, despite not having the evidence until three days before Mr. Travers testified.  Mr. Benbow therefore cannot "show a reasonable probability that an earlier disclosure would have changed the trial's result," United States v. Andrews, 532 F.3d at 906 (citations omitted), or that the information was not obtained "in time to make use of it," United States v. Celis, 608 F.3d at 835.  Mr. Benbow's Brady claim therefore fails.

IV.  CONCLUSION

For the foregoing reasons, the Court will deny Mr. Benbow's Motion [Dkt. No. 613] to Vacate, Set Aside, or Correct his Sentence under 28 U.S.C. § 2255 and his Supplemental Motion [Dkt. No. 642-1] to Vacate, Set Aside or Correct his Sentence under 28 U.S.C. § 2255.  An Order consistent with this Opinion will issue this same day.

SO ORDERED.

 /s/
PAUL L. FRIEDMAN
United States District Judge

DATE:  July 30, 2021